897 A.2d 1200 (2006)
In the Matter of: I.A.C., Minor.
Appeal of: I.C., Mother.
In the Matter of: M.D.C., a Minor.
Appeal of: I.C., Natural Mother.
In the Matter of: M.C., a Minor.
Appeal of: I.C., Mother.
Superior Court of Pennsylvania.
Submitted November 30, 2005.
Filed April 10, 2006.
*1201 Robin D. Bleecher, Harrisburg, for appellant.
Myles A. Kaufmann, Hummelstown, Guardian Ad Litem, for I.C.A., M.D.C. and M.C., appellees.
Jason Kutulakis, Carlisle, for Dauphin County Children and Youth.
BEFORE: JOYCE, ORIE MELVIN and TAMILIA, JJ.
*1202 OPINION BY TAMILIA, J.:
¶ 1 Mother appeals from the March 4, 2005, Decree involuntarily terminating her parental rights to her three children, I.C., a female born May 31, 1993, and two males, Me.C., born September 23, 1994, and Mo.C., born August 19, 1997.[1] We affirm.
¶ 2 With regard only to the youngest child, Mo.C., mother contends the trial court erred by concluding appellee Dauphin County Social Services for Children and Youth, hereinafter "the Agency", (1) presented clear and convincing evidence to satisfy the requirements of 23 Pa.C.S.A. §§ 2511, Grounds for involuntary termination (a)(1), (2), (5) & (8); and, (2) made reasonable efforts toward unification.
¶ 3 The facts underlying the Agency's petition for involuntary termination follow. Docket No. 6336-2005, No. 1, Petition for Involuntary Termination of Parental Rights. As indicated above, the child in question, Mo.C., was born August 19, 1997; he lived with his mother, the appellant, and other siblings.[2] On November 12, 2003, appellant left Mo.C., age six, home alone at night while she purportedly went to do laundry. This fact was discovered when a sibling who was in foster care called the house and asked to speak to her mother at 9:30 in the evening. Mo.C. told his older sister he was home alone and was afraid, so she, along with her foster mother and an Agency worker, remained on the phone with Mo.C. until the appellant returned home. The Agency visited the home the following day, November 13, 2003, and spoke with appellant and the child, whom mother purportedly had kept home from school for the purpose of speaking with the social worker. Appellant stated the child knew how to get in touch with her if need be; mother had Mo.C. demonstrate to the Agency worker on the computer how to look up "contact information."
¶ 4 Five days later, allegedly upon the direction of the appellant, Mo.C. arrived at school with his four-year-old brother in tow. The children were neither wearing socks, nor had they been fed breakfast. When the school called appellant, she came to the school, but denied responsibility for the boys' actions and physical conditions, telling police that she had been sleeping when they left for school. The next day, the school called the Agency again, this time stating that Mo.C. had arrived at school on this winter's day, "without a shirt, underwear or socks[,]" and clearly had not had a bath or been fed that morning. Id. at 3. According to Mo.C., appellant again was sleeping when he left for school that morning. Mother blamed her excessive sleeping on the medication she was taking. On this same date, November 19, 2003, Mo.C. was placed in foster care, where he remains.
¶ 5 The Agency averred in its complaint that when it investigated appellant's home this day, it was in total disorder. "[T]he home appeared in complete disarray, having various hazards of lightbulbs laying on the floor, cleaning water out in the open, and clothing strewn through the first floor. A bloody diaper and sheet, as well as blood on the first floor were also found, which [appellant] later verified belonged to her, stating she had used the diaper as an emergency sanitary napkin." Id. A broken light bulb was on the floor where an infant child was crawling. Mother was arrested and charged with recklessly endangering her children.
*1203 ¶ 6 On December 29, 2003, Mo.C. was found dependent and placed in the legal custody of the Agency by Order dated January 6, 2004.[3] At the dispositional hearing, appellant was ordered to follow and complete the family service plan developed by the Agency, and a goal of reunification was ordered.[4] In the months that followed, however, despite the Agency's plan to reunite appellant with Mo.C., appellant failed to demonstrate any progress toward rectifying the issues that led to Mo.C.'s placement, and the goal was changed from reunification to adoption on October 19, 2004. On February 8, 2005, the Agency filed a petition for involuntary termination of appellant's parental rights, and after a detailed hearing, the Decree was entered. This appeal followed.
¶ 7 Mother avers that during the six months prior to the filing of the termination petition, she made great strides toward remedying the unsafe situations that led to Mo.C.'s placement; she kept her home clean and had sufficient food available. Appellant's brief at 9. Contrary to Agency testimony, appellant argues that during one of Mo.C.'s visits, she left him overnight with a friend, not a stranger, and the reason she refused to provide urine samples was because the demand for same was premised only upon a seven-year-old's statement that she slept too much. Id. at 10-11.
Contrary to the trial court's assessment, the evidence demonstrated that Mother, until her visits were curtailed, was making substantial strides toward achieving reunification with [Mo.C.]. And these efforts were being made up until approximately six weeks prior to the filing of the termination petition. Her inability to complete the plan in a time frame which accords with the American Safe Families Act ("ASFA") should not have been a decisive factor either. Her clinical depression [as the result of her mother's unexpected death in a car crash] played a role in her progress, most notably in the employment objective.
Id. at 12.
¶ 8 In conducting our review, we adhere to the following well-established legal principles:
In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super.2003) (citation omitted).
When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental *1204 rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
In re B.L.W., 843 A.2d 380, 383 (Pa.Super.2004), appeal denied, 581 Pa. 668, 863 A.2d 1141 (2004), (citations omitted). If competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. In re Adoption of T.B.B., at 394.
¶ 9 In a termination proceeding, the focus is on the conduct of the parent. In re B.L.W., at 383. Paramount, however, is that adequate consideration be given to the needs and welfare of the child. In re J.I.R., 808 A.2d 934, 937 (Pa.Super.2002), appeal denied, 573 Pa. 672, 821 A.2d 587 (2003); see also 23 Pa.C.S.A. § 2511(b), Other considerations. In evaluating the needs and welfare of the child, the trial court must consider "whatever bonds may exist between the children and [the parent], as well as the emotional effect that termination will have upon the children." In re Adoption of A.C.H., 803 A.2d 224, 229 (Pa.Super.2002), quoting In re Adoption of A.M.R., 559 Pa. 422, 741 A.2d 666 (1999).
¶ 10 The Agency filed a petition to terminate appellant's parental rights to Mo.C. pursuant to Sections (a)(1), (2), (5) and (8) of 23 Pa.C.S.A. § 2511, Grounds for involuntary termination. In pertinent part, section 2511 provides:
The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
.....
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
.....
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
23 Pa.C.S.A. § 2511(a). We need only agree with the trial court's decision as to any one subsection of 23 Pa.C.S.A. § 2511(a) in order to affirm the termination of parental rights. In re B.L.W., at 384.
*1205 ¶ 11 At the March 4, 2005, termination of parental rights hearing, the court heard testimony from appellant, reunification practitioner Greg Seetoo, Agency counselor Judith Turnbaugh, and Agency placement caseworker, Hope Rohde. Mother began her testimony by addressing the removal of I.C. and Me.C. from her home. She explained that on April 24, 2002, she intentionally beat the children with a stick so that they would be removed from the home. Appellant alleged that she did so primarily because she was not getting any help from the Agency. N.T., 3/4/05 at 16, 22. "They told me that they could not help me and I needed to find ways of my own to resolve whatever we were going through [...] that services had been closed." Id. at 22. Appellant testified that after the two older children were removed, but before the November 19, 2003 incident with Mo.C., she was ordered to work toward the goal of reunification with the assistance of Keystone Intensive Outpatient Program. She admitted, however, that she cooperated only minimally, attending only 17 of 43 scheduled sessions. Id. at 39. Also toward the goal of reunification with the two older children, Keystone spent, to no avail, 14½ hours face-to-face, in-home time with appellant, and 22 hours coordinating services. Id. at 39-40.
¶ 12 As to the youngest of three children, Mo.C., he came into the Agency's care on November 19, 2003, and the petition for termination of appellant's parental rights with regard to him was filed almost 15 months later, on February 8, 2005. At the March 4, 2005, termination hearing, appellant admitted that Mo.C. was removed from the home on November 19, 2002, at age six, because, "[she] screwed up." Id. at 26. Appellant explained that she was taking medicine that made her drowsy (Celexa, an antidepressant), was sleeping 12 hours a day, and Mo.C. "was removed because basically he had been taking care of himself for about a week and a half." Id. at 26-27. Appellant also admitted that Mo.C. went to school, on November 18th and/or 19th, 2003, without adequate clothing and nourishment, and that her home was unsanitary. Id. at 27-28. She testified that on the afternoon the Agency representative came as a result of the school incident, she was awakened at about noon by a phone call; she explained that only a ringing phone could arouse her. Id. at 32. She stated she had used the bloody diaper lying on the floor to stop the menstrual flow that began unexpectedly during the night. Id. at 31. Appellant testified that she hadn't disposed of the diaper because she was busy taking care of her one-year-old's soaked diaper. Id. at 33-34.
¶ 13 The month following Mo.C.'s removal from the home, appellant began overnight and weekend visits with him, a critical step, appellant acknowledged, toward the goal of reunification. Nevertheless, appellant admitted that on December 14, 2004, she left Mo.C. with a friend whose last name she did not know.[5]Id. at 42, 43. On January 6, 2005, because of this incident and the fact appellant refused to provide a urine sample despite her history of marijuana use and the warning that her refusal could affect her visitation, appellant was advised that rather than unsupervised visits in the home, all further visits would be supervised and would be conducted at the local YWCA. Id. at 44-45, 58-60, 103. Incensed or perhaps frustrated *1206 by this turn of events, appellant testified she did not contact the YWCA to schedule those visits until February 7, 2005. Id. at 45. It was also at this point, appellant admitted, that she stopped seeing her therapist. Id. at 53.
¶ 14 The court next heard testimony by Gregory Seetoo, a reunification practitioner with Keystone Children and Family Services who assisted appellant with the reunification process two to three times per week, from July, 2004, until February 16, 2005, when she was discharged as a result of her inaccessibility (inability to maintain regular contact). Id. at 80-82. Seetoo explained his involvement with appellant as follows:
The focus of the service was to assist [appellant] in providing proper care and supervision for her children, ... focusing on her environment, improving the environment of her children, ensuring the educational and physical well-being of her children, assisting with opportunities for her children, positive recreational opportunities during weekend visits, as well as for [appellant] to her own basic needs including medical needs for herself, food needs, basic needs in the home, making sure there's food, shelter, heat, basic needs of the family; and assisting [appellant] in utilizing formal and informal resources in the community until those needs were met.
Id. at 82-83.
¶ 15 As for the home environment, Seetoo testified that during the time period he was involved with appellant, she did make some progress in keeping her home neat. Id. at 92. According to his testimony however, that was where appellant's cooperation with the reunification plan stalled. On December 4, 2004, when Seetoo stopped in to visit Mo.C. during a weekend visit, the child was not there and appellant stated she had left him with a friend.[6]Id. at 95-96. Seetoo explained that this was unacceptable, that the Agency did not know anything about this person (she was not an approved caregiver), and that the purpose of the visits was for her to "spend time with [Mo.C.], to demonstrate an ability to maintain his basic needs, maintain his safety." Id. at 97. Appellant rejected Seetoo's concerns and stated that his worries were self-serving.
¶ 16 Also during this time, Seetoo attempted, unsuccessfully, to help appellant develop a budget and secure consistent employment to meet that budget. Appellant's monthly income was $48, from a utility allowance, and her food stamps had been discontinued. Seetoo testified that between June, 2004 and the March, 2005, hearing, appellant did not maintain steady employment, despite his efforts to assist her. She had left the employ of the temporary agency Manpower, was unsuccessful obtaining any other temporary work through agencies, and did not pursue employment on her own. Id. at 86-91. According to Seetoo, appellant had no physical limitations that would have precluded her from working, and Keystone not only had physically transported appellant to certain potential employers, it had provided her with at least three months' bus passes to assist her search. Id. at 92, 101, 115-166. Keystone's concerted efforts to help appellant obtain and maintain employment were unsuccessful.
¶ 17 According to Seetoo, appellant's efforts to care for Mo.C. were likewise half-hearted and unsuccessful. When Seetoo visited the home on December 17, 2004, two weeks after the previously-discussed caregiver incident, seven-year-old Mo.C. told Seetoo his mother had slept most of the weekend and that he had to prepare his own meals. Id. at 98-99. This is the *1207 visit that prompted the request for a urine sample and the December 30, 2004, meeting, when appellant stated, "she wasn't sure as of that point if she wanted [the agency's] services to continue." Id. at 102. According to Seetoo, after that meeting, Keystone was unable to contact appellant; her cell phone had been turned off, and she did not return messages left on her home phone. Id. at 104. When Seetoo stopped by the house on January 21, 2005, appellant basically informed him that she no longer wanted Keystone's services. Id. at 104-105. Believing appellant may just have been "having a bad day," Seetoo testified he continued unsuccessfully to attempt to contact appellant for the next month. Seetoo summarized for the court that he spent 70 hours face-to-face time with appellant, as well as time spent with other agencies and potential employers. Id. at 107.
¶ 18 The next witness at the termination hearing was Judith Turnbaugh, an employee of Dauphin County Children and Youth (the Agency), who worked with appellant bi-weekly from August 2003, three months prior to Mo.C.'s removal from the home, until August 2004. Id. at 120, 123. Turnbaugh repeated the concerns voiced in the Agency's termination petition regarding Mo.C. being left home alone and his having gone to school in November 2003, without being properly clothed or fed. Id. at 121. Turnbaugh, who was the case worker who visited the home after the school incident, testified only briefly about the condition of the home on that day: "[t]he house was in general disarray. The baby was on the floor crying. [Appellant] had recently been woken up through the phone calls by the school and ourselves." Id. at 122.
¶ 19 Hope Rohde, a placement caseworker for the Agency, testified next in support of the termination of appellant's parental rights. As to her connection with the child Mo.C., Rohde testified that by the time he was removed from the home, the goal for the two older children had been changed to adoption due to mother's failure to comply with the reunification plan; Mo.C.'s plan, instituted December 29, 2003, therefore was developed accordingly. Id. at 135. Mother was required (1) to continue participating in the parent education services offered by Keystone Reunification Services and the Community Action Commission related to child care and supervision; (2) to learn what to expect of seven-year-old Mo.C. and appropriately supervise him to as to assure his safety; (3) to develop coping strategies for stress; (4) to receive and utilize psychiatric and psychological services; (5) to be available for scheduled and unscheduled visits; and (6) to follow through with her probation officer. Id. at 136-137. Rohde testified that even before the November, 2003 incidents that prompted removal of Mo.C. from the home, the Agency was concerned with appellant's lack of employment and her inability or refusal to follow through with the service plan; the Agency feared for the children's safety and was concerned that appellant had no food in the house, and did not pay her utility bills. "[S]o we had great concern with regards to that and her inability to maintain her living." Id. at 143. The urine testing, Rohde testified, was requested as the result of evidence appellant was sleeping excessively and had a prior history of drug use. Id. at 144. Rohde explained, however, that appellant refused the Agency's multiple requests for a sample. Id. at 145. Lastly, Rohde testified that in February, 2005, when appellant was challenged about the fact that the Agency was unable to contact her, mother replied, "you'll just have to wait until I call you." Id. at 145.
¶ 20 As set forth above, § 2511(a)(5) allows for termination of a *1208 parent's rights provided the child in question has been out of the home for a period of at least six months, and the parent has, "evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Id. Mo.C. was removed from appellant's home on November 19, 2003, and the petition for termination was filed February 5, 2005, well beyond the six-month period required. The record before us establishes appellant, "has refused or failed to perform" her parental duties, as evidenced by the fact that the conditions that led to placement remain. As discovered through testimony, while appellant has made some effort to clean her home and obtain a psychiatric/psychological evaluation, she has done nothing else required by the reunification plan; most importantly she has not taken the steps necessary to assure Mo.C.'s safety and well-being when in her care. To the contrary she has demonstrated defiance and indifference to all efforts of assistance by the Agency and its associates, placing her needs and wants ahead of those of her children. See In the Interest of A.L.D., 797 A.2d 326, 337 (Pa.Super.2002) (concluding parental rights can be terminated not only due to parental incapacity, but also for acts of refusal); see also In re V.E. and J.E., 417 Pa.Super. 68, 611 A.2d 1267, 1271 (1992) (holding a parent must show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable him or her to meet the duties and obligations inherent in parenthood).
¶ 21 At the time of the hearing, mother had been involved with the Agency for nine years, six of which were due to her inability to care for her children.[7] To date, appellant has made little affirmative effort to prove her ability to parent and regain custody of her children. As summarized by the court, "Mother has not made progress toward reunification or performance of her parental responsibilities." Trial Court Opinion, Hoover, J., 7/29/05, at 6. Further, a review of the record supports the conclusion that the Agency made more than reasonable efforts toward reunification. We find no basis upon which to disturb the trial court's rulings, and the court was justified in terminating appellant's parental rights as to Mo.C.[8]See In re B.L.W., supra (holding this Court need only agree with the trial court's decision as to any one subsection of 23 Pa.C.S.A. § 2511(a) in order to affirm the termination of parental rights).
¶ 22 Appellant also argues, "the trial court erred or abused its discretion when it granted C & Y's petition to terminate Mother's parental rights to I.C. [Me.C.], and [Mo.C.] given that the agency did not provide competent evidence to demonstrate clearly and convincingly that termination would serve the best interests of the children[,]" as is required by 2511(b), Other considerations.[9] Appellant's brief at 4. Appellant argues the Agency presented no evidence, other than hearsay testimony, concerning the bond or relationship that existed between her and the children.
¶ 23 Initially, we note that while "the best interests of the child" is the appropriate standard when applied at the time of an adoption proceeding, it is not *1209 the standard of review to be applied in termination of parental rights proceedings. In re Adoption of A.M.B., 812 A.2d 659 (Pa.Super.2002). We are looking, rather, to "what will best serve the needs and welfare of the child". See In re J.I.R., supra; see also 23 Pa.C.S.A. § 2511(b). Appellant challenges the court's consideration, or lack thereof, of the emotional bonds that exist between her and the children.
¶ 24 We conclude clear and convincing evidence was presented to prove that the bonds that existed between parent and child, if any, were so tenuous and destructive as to unequivocally warrant severance. Appellant's failure to supervise her children resulted in the physical abuse of the two older children, purportedly in their best interests; mother intentionally beat I.C. and Me.C., as evidenced by explicit photographs, and those same two siblings engaged in sexual activities together.[10] When told by Agency officials and the guardian ad litem that adoption was being considered, neither child expressed a desire to return to appellant. I.C.'s only concern was being able to visit and/or live with her siblings, and Me.C. expressed outright anger toward appellant for the lifestyle he endured while with her. Both children were doing well in their foster homes and expressed a desire to remain there. As for Mo.C., he has been living in the same foster home since November, 2003, is thriving physically, emotionally, and academically, and Mo.C.'s foster mother has expressed a definite interest in adopting him.[11]
¶ 25 While appellant offered self-serving testimony concerning her love and devotion to her children, her actions, or sometimes lack thereof, belie her words. We agree with the trial court that the children's needs and welfare will be best served by terminating their mother's parental rights and giving them the opportunity to be adopted into a caring and loving home, where they will be safe and free from worry that by right does not belong to a child.
¶ 26 Decree affirmed.
NOTES
[1] We have used the initials utilized by the trial court; I.C., Me.C., and Mo.C. Appellant's brief refers to the children as I.C., M.D.C., and M.C., respectively.
[2] In addition to the three children at issue here, appellant has three other children who live with their father.
[3] The other two siblings at issue had been declared dependent April 25, 2002, and were placed in foster homes where they have remained.
[4] The reunification plan required that appellant (1) participate in Keystone Reunification Services and the Community Action Commission; (2) provide supervision that would ensure her children's safety; (3) develop strategies to cope with stress; (4) receive psychological and psychiatric evaluations and follow any recommendations; (5) participate in County mental health services; (6) receive counseling specific to the sexual behavior of her children and herself; (7) be available for scheduled and unscheduled visits by the Agency; and (8) follow the safety plan created by the Agency with regard to proper supervision of her children. N.T. 3/4/05, at 136-137.
[5] Counsel asked mother whether she left the child at a friend's during one of Mo.C.'s weekend visits, but references the date as December 14, 2004, a Tuesday. Seetoo testified that the incident in question occurred on December 4, 2004, a Saturday. Because the parties agree and the record supports that the incident occurred during a weekend visit, we can only assume the correct date is December 4, 2004.
[6] See footnote number five.
[7] Appellant's initial contact with the Agency was in 1996, when she struck her mother in the head with a hammer.
[8] While there is a plethora of testimony regarding appellant's failure to care for I.C. and Me.C., mother does not make an argument with regard to these two children.
[9] Section 2511(b), 42 Pa.C.S.A., states, in pertinent part, that "[t]he court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."
[10] Testimony was also offered that while in appellant's care, I.C. was sexually abused by her uncle and her cousin.
[11] The guardian ad litem for all three children, Myles Kauffman, Esquire, was unable to appear at the termination hearing, but did submit a letter dated March 1, 2005, stating his position on behalf of the children. The letter is included in the certified record, and states in pertinent part that it is his opinion the children's best interests would be served by changing the Agency goal to adoption. Kauffman opined that appellant (1) "has continuously demonstrated an inability to properly care for, control and/or supervise the children"; (2) "has demonstrated an inability or unwillingness to make reasonable efforts toward improving her parenting skills"; and (3) the circumstances that originally caused placement have not been remedied. Specifically as to Mo.C., the guardian stated that despite mother's initial cooperation, once she was granted unsupervised visitation, she immediately fell back into her pattern of leaving Mo.C. with friends, staying out late and sleeping until very late the day.