J-S68030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.E. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: H.A. | : | |
| | : | |
| | : | No. 1227 WDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-25-2019

BEFORE:   GANTMAN, P.J.E., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED JANUARY 06, 2020**

H.A. (Father) appeals from the order, entered in the Court of Common Pleas of Allegheny County, terminating his parental rights to his son, A.J.E. (Child) (born 3/2017), pursuant to section 2511(a)(2), (a)(5), (a)(8) and (b) of the Adoption Act.[1]  On appeal, Father claims the Allegheny County Office of Children, Youth and Families (CYF) did not meet its burden of proving by clear and convincing evidence that termination of Father's parental rights best served Child's needs and welfare.  23 Pa.C.S.A. § 2511(b).  After our review of the record and the arguments on appeal, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S.A. §§ 2101 *et seq*.

A.S.E. (Mother) gave birth to Child while incarcerated.[2]  At that time, Father had not been identified.  Child was placed in a foster home when he was four days old.  Two months later, in May 2017, after Father's paternity was confirmed, CYF met with Father and performed a home assessment.  At that time, Father resided in a one-bedroom apartment, was not working, was on disability, had been diagnosed with bipolar disorder and schizophrenia, and was taking medication for his mental health disorders.  N.T. Termination Hearing, 7/12/19, at 14-15.

On June 7, 2017, the Honorable Dwayne D. Woodruff adjudicated Child dependent. The court based its adjudication on Mother's stipulation of incarceration and mental health issues and Father's stipulation that he was unwilling or unable to care for Child at that time.  Order of Adjudication and Disposition, 6/7/17.  The court placed Child with a maternal cousin, A.H., where he remained until February 19, 2019, when custody was given to paternal grandfather, H.A., Jr.[3] (Grandfather).  Grandfather is Child's current foster parent and is an adoptive resource.  *Id.* at 21-22.

On February 7, 2019, CYF sought termination of both Father's and Mother's parental rights to Child.  With respect to Father, CYF alleged that despite various services, including in-home visitation coaching, Father, over an eighteen-month period, did not progress in meeting the goals of his family

---

[2] Mother is not a party to this appeal.

[3] We note Judge Woodruff presided over both the dependency and termination proceedings in this case.

service plan (parenting, housing, and maintaining mental health). On July 12, 2019, the court held a termination of parental rights hearing. Following the hearing, the court entered an order terminating both Father's and Mother's parental rights to Child. Father filed this appeal.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations omitted).

Father acknowledges that Child has been in placement for the statutory period. *See* 25 Pa.C.S.A. § 2511(a)(8) (child has been removed from care of parent, 12 months or more have elapsed from date of removal or placement, conditions which led to removal or placement continue to exist, and termination would best serve needs and welfare of child). He contends, however, that the court erred in finding CYF met its burden of proving by clear and convincing evidence that termination would best serve Child's needs and welfare. *See* 23 Pa.C.S.A. § 2511(b) (if grounds for termination under subsection (a) are met, court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.").

Section 2511(b) provides:

**(b) Other considerations**.--The court in terminating the rights of a parent *shall give primary consideration to the developmental, physical and emotional needs and welfare of the child*.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b) (emphasis added).  The emotional needs and welfare of the child have been interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).   Further, this Court has determined that a "needs and welfare" analysis requires an examination of the "natural parental bond."  *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).  *See In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012) (court should pay "utmost attention" to discerning effect on child of permanently severing parent/child bond); *see also T.S.M.*, *supra* at 268 (when considering termination, court must consider whether child is in pre-adoptive home and whether child has bond with foster parents).

In this context, the court must take into account whether a bond exists Between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.  *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000) (en banc).  When conducting a bonding analysis, the court is not required to use expert testimony.  *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008) (citing *In re I.A.C.*, 897 A.2d 1200, 1208-09 (Pa. Super. 2006)).  Social workers and caseworkers can offer evaluations as well.  *See*

*In re A.R.M.F.*, 837 A.2d 1231 (Pa. Super. 2003) (court properly terminated parental rights where decision based in part on social worker's and caseworker's testimony that children did not share significant bond with biological parents and were well bonded with foster parents). Additionally, section 2511(b) does not require a formal bonding evaluation. *In re K.K.R.-S.*, *supra* at 533. Here, several witnesses testified with respect to Child's bond with Father.

CYF caseworker Justine Jordan testified, "[Child] goes to his father. He likes to be picked up by his dad and held. I've observed [F]ather sit with [Child] and watch videos on his phone." N.T. Termination Hearing, *supra* at 60. She also stated "[Child] is two, so he has been having visits with his father for the past few years. I mean, there is a connection there." *Id.* at 89.

CYF caseworker Martin Dorfman also testified. He provided Father with two-hour parenting instruction sessions for "six or seven" visits. *Id.* at 161. He stated that despite his suggestion to Father to get down on the floor and play with Child, Father "parented from the couch." *Id.* at 151. Dorfman stated that Child "certainly seemed happy to see [F]ather when he got there." *Id*. at 164. He also stated that Child liked to sit with Father to watch videos, but Child did not seek out Father's attention and primarily played on his own. *Id.* at 164.

Kirk Thoma, a visit coach from Project STAR,[4] also worked with Father twice a week from April 2019 to June 2019.[5] He testified similarly, describing the interaction between Father and Child as follows: "[Father] would prefer to just hold [Child] on his lap and use the phone to listen to videos, watch videos[.]" *Id.* at 109. He testified that, despite repeated suggestion there was "less of the interaction on the floor with toys and so forth and that usually meant that I needed to prompt [F]ather to try to do more of that kind of thing so that there was learning in play[.]" *Id.* Thoma acknowledged, "there was definitely a connection there," but emphasized that Child "would look for [Father] to engage with him while he was playing and that wasn't happening." *Id.* at 113.

Terry O'Hara, Ph.D., a court-appointed psychologist, also testified. Doctor O'Hara performed evaluations on Father between May and mid-June of 2019. He testified to his observations of Father's interactions with Child as follows:

_____

[4] Founded in 1985, Project STAR is licensed by the Pennsylvania Department of Public Welfare as an adoption, foster care and private children and youth social service agency. Project STAR provides services for children in need of permanency from infancy through the age of 21. https://www.alleghenycounty.us/Human-Services/News-Events/Engagement/Foster-Care/Meet-the-Agencies/City-of-Pittsburgh-Agencies.aspx (last visited 12/17/19).

[5] Services were discontinued according to Project Star policy because Father missed three scheduled appointments within a 30-day period. N.T. Termination Hearing, *supra* at 105.

For extended periods of time [Father] was not particularly interactive or engaging with [Child]. He acknowledged to me that he had to be prompted typically even at this time by the in-home service clinician who supervises visits, I believe from Project STAR, who also did not contact me until after the report was submitted, unfortunately. But [Father] stated that to me that he still needed prompting by Project STAR when he's with his son. I did observe that myself, that he was not particularly engaging and would have benefited from prompting, although that's not my role as the evaluator. He also seemed to direct himself to me throughout the evaluation as opposed to engaging with his son, even after I specifically provided him with unstructured time with his son. During this evaluation [Father] continued to complain about his own father and this seemed to be a theme that he can really perseverate upon. I would be concerned about him perseverating upon this theme and also other themes of persecution and paranoia to the extent that [Child] would be at risk of not being supervised. . . . I didn't see him utilizing [Father] as a secure base, and this was qualitatively different from how [Child] was with his paternal grandfather during their interaction[.]

*Id*. at 179-80.

Thus, the evidence presented did indicate a bond, described by the evaluators as a "connection," between Father and Child. Of note, however, Dr. O'Hara opined that termination of that bond would not be detrimental to Child:

Q: [D]id you observe in [Child] such a significant relationship, attachment or bond with [Father] that if that bond were to be severed [Child] would be detrimentally hurt?

A: I think that's a question that has many parts. I think my main concerns in this case included [Father's] level of stability. From my perspective, he had not demonstrated the stability necessary to care for a child's needs and welfare. I'm very concerned with his ongoing history of psychiatric hospitalization. He reported . . . being in treatment at [Western Psychiatric Institute and Clinic] at the time of my evaluation of him for only approximately one month, and I didn't' see a narrative of him

considering the seriousness of his psychiatric history and that he suffers from major mental illness. . . . So I would have a lot of concerns with even unsupervised time at this point. *I didn't have much evidence, at least during this observational period, that [Child] has much security in his relationship with [Father], but there was some collateral data from the Arsenal report, for example, that [Child] appeared to feel pretty comfortable with [Father]. But from the standpoint of attachment, security and attachment really supposes consistency, responsiveness, nurturance and emotional stability for a caregiver, I don't think [Father] would be able to establish that sort of stability and responsiveness and nutur[ing] for his son if his mental health needs are not more sufficiently addressed.*

*Id.* at 181-84 (emphasis added).

With respect to Child's bond with Grandfather, Dr. O'Hara testified as follows:

[Child] was very curious, vocal. He smiled, he sang, he was playful, calm and relaxed. He explored toys. He interacted well with his grandfather. So I thought his comportment toward [F]ather was–toward [Father] and grandfather were completely different, and I think that this has a lot to do with the parenting presences by [Father] and [Grandfather]. [Father], as I mentioned, seemed to be preoccupied with his own father and was often interacting with me, not particularly engaging with [Child], and this was concerning as he's had a lot of parenting training thus far, but on the other hand, [Grandfather] was very interactive with [Child]. He showed affection, he had a gentle presence with him, and I think [Child] responded much better to this sort of interaction, this sort of–these sorts of parenting skills exhibited by [Grandfather].

*Id.* at 181.

This Court has emphasized that "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." **T.S.M.**, **supra** at 267. "Common sense dictates that

courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. "As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *Id.* Further, courts must keep "the ticking clock of childhood ever in mind[.]" *Id.* at 296.

> Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. [The Adoption and Safe Families Act] [(]ASFA[)][6] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons.

*Id.* (citations omitted).

With these considerations in mind, we acknowledge the existence of a bond between Father and Child. However, we agree with the trial court's assessment that termination of that bond would not negatively affect Child.

---

[6] 42 Pa.C.S.A. §§ 6301–65.

In his opinion, Judge Woodruff determined that Child has a "positive parent-child relationship with Grandfather," and that Grandfather provides for Child's "support, comfort and wellbeing" as well as Child's "emotional, medical and educational needs." Trial Court Opinion, 8/13/19, at 11. As the record supports the court's conclusions under section 2511(b), we see no reason to disturb its decision. Given Child's strong bond with Grandfather, we conclude the court did not abuse its discretion in concluding that termination of Father's rights would best serve the "developmental, physical and emotional needs and welfare" of Child. 23 Pa.C.S.A. § 2511(b).[7] *See In re T.S.M.*, *supra*.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/6/2020

---

[7] We note counsel for Child has filed a brief in support of the trial court's order terminating Father's parental rights. *See* Brief for Appellee, A.J.E., a minor, at 18 ("Given the Child's young age, his Father's continued instability, and the secure attachment the Child had developed with Grandfather, the [t]rial [c]ourt did not err by finding that termination of Father's rights serves the Child's needs and welfare.").