J-S57030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: R.B., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: G.B., FATHER | |
| | No. 324 WDA 2016 |

Appeal from the Order February 1, 2016
In the Court of Common Pleas of Crawford County
Orphans' Court at No(s): No. O.C. 2015-18

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN and STRASSBURGER,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED SEPTEMBER 12, 2016**

G.B. ("Father") appeals from the order and final decree entered February 1, 2016, granting the petition filed by A.E. ("Mother") and J.E. ("Stepfather") to involuntarily terminate Father's parental rights to R.B. ("Child").  We affirm.

We adopt the thorough recitation of facts and procedural history set forth in the orphans' court adjudication.  **See** Orphans' Court Memorandum and Order, 2/1/16, at 1–5.  As the orphans' court summarized:

> Father has been in prison for all of [Child's] life besides the approximately year and a half between his terms of incarceration.  Father was in prison when [Child] was born [in June of 2008], and Father is currently in prison as [Child] is seven years old. During these periods of incarceration, Father

---

[*]  Retired Senior Judge assigned to the Superior Court.

has: visited with [Child] in person on approximately five or six occasions, all of which occurred before 2012 and none of which resulted in positive interaction between Father and [Child]; written only a few and no more than ten letters to [Child], only a few of which included meaningful content and even less of which were actually for [Child]; mailed approximately two cards and no gifts to [Child]; and spoken only sporadically with [Child] on the phone. Father's minimum date for release is May 9, 2016 with a maximum date for release being November 9, 2018. Father explained that, due to the nature of the incident surrounding his incarceration,[1] he expects that he will be held for a period longer than his minimum date for release.

At the hearing, the guardian *ad litem* (G.A.L.) recommended that Father's parental rights be terminated to allow for Stepfather's adoption of [Child]. The G.A.L. conveyed that [Child] is not connected with Father. [Child's] only recollections of interactions with Father are an occasion in which they watched television together and the traumatic incident in which Father fought with Mother, jumped on the moving vehicle, and shattered the car's windshield. When asked about her family, [Child] does not include Father as a member, and [Child] does not ask about nor express an interest in contacting Father. At this point, Father's absence is not impactful to [Child].

***Id.*** at 5.

Mother and Stepfather filed the instant petition to terminate Father's parental rights on April 27, 2015, under 23 Pa.C.S. §§ 2511(a)(1), (a)(2), and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

---

[1] In December 2011, Father was convicted of involuntary manslaughter arising from an altercation with a prison guard. Father was sentenced to prison for a minimum term of thirty months to a maximum term of sixty months.

**(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(1), (2), and (b). Following hearings held on October 7, and October 22, 2015, the orphans' court concluded that the petitioners had "established a legal basis for the termination of parental rights of [Father]." Order, 2/1/16, at unnumbered 1. Father appealed.

Father raises the following issues for review:

1. Did the trial court commit an abuse of discretion or error of law when it concluded that the Petitioner established sufficient grounds for termination under 23 Pa.C.S.A. Section 2511(a)(1)?

2. Did the trial court commit an abuse of discretion or error of law when it concluded that the Petitioner established sufficient grounds for termination under 23 Pa.C.S.A. Section 2511(b)?

3. Was appointed counsel ineffective in her representation of father at the involuntary termination hearing for failure to call certain witnesses?

4. Whether the failure to file a concise statement of matters complained of constitutes waiver in the context of this case?

Father's Brief at 3–4.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. [O]ur standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel-Bassett v. Kia Motors America, Inc.*, [613] Pa. [371], 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 575 Pa. 647, 654, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). The burden is upon the petitioner to prove by clear and convincing evidence that the

asserted grounds for seeking the termination of parental rights are valid. *In re: R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

As suggested by Father's fourth issue, we initially must determine if we can consider the merits of Father's appeal when Father did not file a Pa.R.A.P. 1925(a)(2)(i) statement with his appeal. As this case arose from a petition for involuntary termination of parental rights, it is deemed a children's fast track appeal. Pa.R.A.P. 102 (Definitions). In a children's fast track appeal, "[t]he concise statement of errors complained of on appeal shall be filed and served with the notice of appeal required by Rule 905." Pa.R.A.P. 1925(a)(2)(i).

We have addressed the failure of an appellant to file a statement of errors complained of on appeal with the notice of appeal, holding:

> [H]enceforth, the failure of an appellant in a children's fast track case to file contemporaneously a concise statement with the notice of appeal pursuant to rules 905(a)(2) and 1925(a)(2), will result in a defective notice of appeal. The disposition of the defective notice of appeal will then be decided on a case by case basis. . . .

*In re K.T.E.L.,* 983 A.2d 745, 747 (Pa. Super. 2009). In *K.T.E.L.,* we declined to quash or dismiss an appeal due to a mother's failure to strictly comply with Pa.R.A.P. 1925(a)(2), where there was no "prejudice to the other parties on the case, and in light of the presumed purpose of the new amendments—to expedite the disposition of children's fast track cases." *Id.* at 748.

Since **K.T.E.L.,** we have consistently overlooked an appellant's failure to comply with Rule 1925(a)(2) in the absence of prejudice. **See, e.g., J.M.R. v. J.M.,** 1 A.3d 902, 906 (Pa. Super. 2010) (holding father's failure to comply with Pa.R.A.P. 1925(a)(2)(i) was harmless where "misstep was not prejudicial to any of the parties and did not impede trial court's ability to issue a thorough opinion"); **Harrell v. Pecynski**, 11 A.3d 1000, 1003 (Pa. Super. 2011) (addressing merits of appeal where father filed Rule 1925(a)(2) statement one month after notice of appeal, but mother did not object or claim prejudice, and trial court addressed father's claims of error); **In re R.N.F.,** 52 A.3d 361, 362–363 (Pa. Super. 2012) (citing **K.T.E.L.** to overlook appellant's failure to comply with Rule 1925(a)(2)(i) when no court order has been violated).

As stated above, Father did not file a Rule 1925(a)(2) statement with his notice of appeal. However, neither the trial court nor this Court ordered Father to file a statement. We also consider that the trial court filed an opinion in which it thoroughly addressed its rationale for termination of Father's parental rights. Finally, Mother did not object or claim prejudice. Indeed, in her brief, Mother took "no position with respect to waiver in this case." Mother's Brief at 24. Thus, we decline to dismiss Father's appeal for failing to comply with Rule 1925(a)(2) and will discuss Father's issues.

Father first argues that the orphans' court erred when it concluded that termination of his parental rights was warranted under 23 Pa.C.S. §

2511(a)(1).[2] Father specifically challenges the orphans' court's: 1) finding that Father's recurrent incarcerations and violent behavior witnessed by Child created the barriers that stood between Father and Child having a meaningful relationship; 2) failure to consider that Mother interfered in Father's ability to have contact with Child and thwarted his efforts to utilize the opportunities available to him to act as a parent to Child; 3) failure to credit Father's efforts to communicate with Child; and 4) incorrect analysis of Father's ability and willingness to pay child support.

We have reviewed these four assertions of error and conclude that the orphans' court competently addressed these allegations. Accordingly, we adopt the orphans' court's reasoning on these issues as our own. *See* Orphans' Court Memorandum and Order, 2/1/16, at 6–11.

We thus turn to Father's contention that the orphans' court did not credit Father's testimony at the termination hearing regarding the effects of a head injury sustained by Father in 2009 as a result of an automobile accident. The injury occurred in the brief period during Child's lifetime when

_____

[2] The orphans' court also referenced 23 Pa.C.S. § 2511(a)(2) in the Conclusions of Law section of its Memorandum and Order. However, it is clear from the construct of its writing that the court terminated Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1). This Court may affirm the orphans' court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

Father was not incarcerated. According to Father, he was involved in a serious automobile accident in October 2009. N.T., 10/22/15, at 12. Father spent a week in the hospital in an induced coma, and another week in a rehabilitation facility. *Id*. Father testified that following the accident he "was a mess," "emotionally . . . kind of haywire," and experienced short term memory deficits. *Id*. at 17.

The orphans' court assessed Father's parenting of Child following his March 2009 release from prison, as follows:

> After Father's release, the parties and [Child] lived together as a family in Crawford County, and the parties later married in the fall of 2009. While the three individuals lived under the same roof, Father focused on his own activities such as watching television or playing X-Box while Mother performed the primary parental role for [Child]. Mother testified to Father's abusive history with her at that time. This testimony was credible as Mother appeared visibly shaken and emotional while detailing accounts of Father's abuse. Although the Court does not find that [Child] was ever a victim to this abuse, the Court is satisfied that [Child] was nonetheless regularly exposed and, thus, impacted by this.
>
> As the parties' relationship was volatile, Mother and [Child] eventually moved away from Father and into maternal uncle's home; however, the parties maintained some form of relationship and continued to see each other. On May 27, 2010, Mother responded to physical and verbal abuse from Father by involving law enforcement and filing a Protection from Abuse (P.F.A.) petition against Father. Additionally, Mother filed a Complaint for Custody that same day. In June of 2010, Mother withdrew her request for custody mediation and vacated the P.F.A. in order to attend counseling and work out any differences with Father. At this time, there was no custody order. The parties remained largely physically separated and made custody arrangements by agreement and Father's interactions with [Child] were minimal. For the most part, Father only saw [Child]

while visiting with Mother, rarely exercised his custodial rights, and had little, if any, overnight visitation.

In late August of 2010, the parties once again aggressively argued and Father jumped onto the hood of Mother's car and broke her window while [Child] was in the backseat of the vehicle. Mother filed a second P.F.A. petition against Father, and Father was arrested and jailed for a parole violation. Father was under state parole supervision. Thus, the violation led to his imprisonment.

Orphans' Court Memorandum and Order, 2/1/16, at 1–2.

Father is correct that the orphans' court did not consider Father's testimony concerning the effects of his head injury in reaching its termination decision. However, the orphans' court omission in this regard does not constitute reversible error. We have reviewed the testimony concerning Father's head injury and find that it did not offer any reliable evidence that the injury compromised Father's ability to parent. Father did not relate how the injury affected his relationship with Child nor did he present any medical testimony that his mental health impaired his ability to parent. We further observe that Father did not reference either the accident or its consequences in the Proposed Findings of Fact and Conclusions of Law he submitted to the orphans' court following the termination hearing. Father's Proposed Findings of Fact and Conclusions of Law, 12/1/15, at 1–6. Accordingly, Father is not entitled to relief on this claim.

Father next takes issue with the orphans' court's analysis pursuant to 23 Pa.C.S. § 2511(b), arguing that the orphans' court disregarded certain

documents evidencing Child's affection for Father and conducted its bonding assessment without the benefit of expert testimony. The orphans' court opined that the termination of Father's parental rights would serve the Child's need and welfare based on the following rationale:

After a careful reading of the record and review of evidence, this case does not yield any suggestion of a strong bond or of any bond at all. Besides a span of approximately a year and a half, Father has been incarcerated for all of [Child's] life. The record reflects that Father has not spoken with [Child] since sometime before November of 2013 when [Child] was approximately five years old. Further, Father has not seen [Child] since approximately 2011 when [Child] was approximately three years old, and the credible testimony of record indicates that [Child] did not respond positively to seeing her Father at that time. Even while Father was not in prison, Father and [Child] did not have a strong relationship as Father's interactions with [Child] usually surrounded Father's primary purpose to visit with Mother. Although Father credibly testified to his love for [Child], the analysis focuses on the parent and child's emotional bond and the effect on *the child* of permanently severing such bond. According to the G.A.L., [Child's] recollections of Father are[] meager; in the instance of Father's dispute with Mother in August of 2010, negative; and, presumably, traumatic. [Child] does not consider Father a part of her family nor did she express to the G.A.L. a legitimate interest in building a relationship with him.

Recognizing the lack of a parent-child bond between Father and [Child] and that the severance of their relationship would be without detriment to [Child], the Court looks to [Mother's] stated hope for Stepfather to adopt [Child]. While Father has been incarcerated and absent for [the] majority of [Child's] upbringing, Stepfather has been a part of [Child's] life since she was approximately two years old. Stepfather has cared for [Child] in a parental capacity as he is active in her daily routine. Stepfather assists with transporting [Child] to school, prepares meals for [Child], and teaches [Child]. Stepfather and [Child] have a strong, positive relationship, and [Child] perceives Stepfather's family as her own. Stepfather has long provided

financial and emotional support to [Child], and he is ready, willing, and able to adopt [Child].

   The G.A.L. recommended that the termination of Father's parental rights be granted and that the petition for adoption proceed. The G.A.L. conveyed to the Court that [Child] considers Father a bad person and does not perceive him as a member of her family. The G.A.L. does not sense that [Child] is connected to Father and does not believe that severance would detrimentally affect [Child]. The Court accepts the G.A.L.'s recommendation as impactful and agrees.

Orphans' Court Memorandum and Order, 2/1/16, at 11–12 (citation omitted) (emphasis in original).

After review, we conclude that the orphans' court's findings are supported by the record, and it reasonably concluded that the elements of 23 Pa.C.S. § 2511(b) were met. The orphans' court's failure to credit certain letters in which Mother noted that Child missed and loved Father was likely reasoned by the fact that they were written in 2011 and had negligible evidentiary value concerning Child's bond with Father.[3] Further,

   When conducting a bonding analysis, the court is not required to use expert testimony. *In re K.K.R.-S.,* 958 A.2d 529, 533 (Pa. Super. 2008) (citing *In re I.A.C.,* 897 A.2d 1200, 1208–09 (Pa. Super. 2006)). Social workers and caseworkers can offer evaluations as well. *See In re A.R.M.F.,* 837 A.2d 1231 (Pa. Super. 2003) (holding court properly terminated parental rights where decision was based in part on social worker's and caseworker's testimony that children did not share significant bond with biological parents and were well bonded with their

_____

[3] The orphans' court viewed these 2011 letters from Mother as demonstrating Mother's "genuine desire and encouragement for Father to have a positive relationship with [Child]." Orphans' Court Memorandum and Order, 2/1/16, at 8.

- 11 -

foster parents). Additionally, Section 2511(b) does not require a formal bonding evaluation. *In re K.K.R.-S.*, *supra.*

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Therefore, there was no abuse of discretion or error of law in the orphans' court's section 2511(b) analysis. Father's argument that his parental rights were wrongfully terminated under 23 Pa.C.S. § 2511(b) is without merit.

Father's third argument challenges the effectiveness of his counsel. A party alleging ineffective assistance of counsel in a termination of parental rights case must show by clear and convincing evidence that it is more likely than not that the result of the proceeding would have been different, absent the alleged ineffectiveness. *In re K.D.*, 871 A.2d 823, 829 (Pa. Super. 2005).

Based on the overwhelming evidence in favor of terminating his parental rights, Father cannot establish by clear and convincing evidence that, absent counsel's alleged ineffectiveness, the result of the hearing would have been different. Father avers that he requested counsel to call four witnesses, and counsel failed to do so because of time constraints. First, the record does not include any evidence that Father requested his counsel to present the additional witnesses; nor does Father identify such place in the record. Additionally, only one of those witnesses, Father's sister, Alexandra Brown, was present at the hearing. When Father's counsel indicated that she would not be calling Ms. Brown as a witness, Father did

not challenge this decision on the record. Nor did the orphans' court preclude Ms. Brown's testimony because of time factors.

Substantively, Father cannot demonstrate that the testimony of these proposed witnesses would have changed the outcome of the termination proceeding. One suggested witness, Rodney Wise, was a police officer who responded to the scene when Father jumped on Mother's vehicle. Officer Wise would purportedly testify that Mother overstated the facts leading up to Father's incarceration and that the officer recommended that Father's parole not be revoked. However, the facts in evidence demonstrate that Father was in fact incarcerated and that the parole board revoked Father's parole.

The other three purported witnesses were Ms. Brown, and Robert Cory and Megan Cory, employees of the church Father attended. Father claims that these witnesses would have testified to a positive interaction between Child and Father. Father, however, does not identify the timeframe when these witnesses observed these interactions. Since Father has not seen Child since 2011, these alleged interactions would have been observed four years before the termination proceedings and would have dubious impact on the orphans' court's decision to terminate Father's parental rights. Father's claim of ineffective assistance of counsel is frivolous.

We thereby conclude that the orphans' court's factual findings are supported by the record and that there was no abuse of discretion or error of

law underpinning the orphans' court's decision to terminate Father's parental rights. Accordingly, we affirm the termination order and final decree.

Order and Final Decree affirmed.[4]

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/12/2016

_____

[4] We direct the parties to include the redacted version of the Orphans' Court Memorandum and Order filed February 1, 2016, in all future filings relating to our examination of the merits of this appeal.

I CERTIFY THIS TO BE A TRUE COPY OF ORIGINAL
ON FILE IN THE CLERK OF COURTS OFFICE

CLERK OF COURTS, CRAWFORD COUNTY, PA

MY COMMISSION EXPIRES

Circulated 08/24/2016 09:31 AM

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION

In re: ████████████████
████████████████

:
:
:
:
:
:
:
:

No. O.C. 2015-18

## MEMORANDUM AND ORDER

MARK D. STEVENS, J.                                                                                  January 29, 2016

Presently before the Court is the Petition of A███████████, hereinafter "Mother" and
████████, hereinafter "Stepfather", seeking to terminate the parental rights of G████
████ hereinafter "Father", regarding his daughter R███████, hereinafter "the Child". The
Petition for Involuntary Termination of Parental Rights of the Father was filed on April 27, 2015.
An Involuntary Termination of Parental Rights (I.V.T.) hearing spanned the dates of October 7
and October 22, 2015 where the Court heard the testimonies of Mother, Father, Stepfather, and
█████████████████████ hereinafter "Paternal Grandmother". At the parties' request, the Court
provided an opportunity to file findings of fact by December 1, 2015.

## FINDINGS OF FACT

When R██ was born on June 2, 2008, Father was incarcerated for a false imprisonment
conviction, and he was not released until approximately ten months later in March of 2009. After
Father's release, the parties and the Child lived together as a family in Crawford County, and the
parties later married in the fall of 2009. While the three individuals lived under the same roof,
Father focused on his own activities such as watching television or playing X-Box while Mother
performed the primary parental role for R██ Mother testified to Father's abusive history with
her at that time. This testimony was credible as Mother appeared visibly shaken and emotional
while detailing accounts of Father's abuse. Although the Court does not find that the Child was
ever a victim to this abuse, the Court is satisfied that the Child was nonetheless regularly
exposed and, thus, impacted by this.

As the parties' relationship was volatile, Mother and R██ eventually moved away from
Father and into maternal uncle's home; however, the parties maintained some form of
relationship and continued to see each other. On May 27, 2010, Mother responded to physical
and verbal abuse from Father by involving law enforcement and filing a Protection from Abuse
(P.F.A.) petition against Father. Additionally, Mother filed a Complaint for Custody that same
day. In June of 2010, Mother withdrew her request for custody mediation and vacated the P.F.A.
in order to attend counseling and work out any differences with Father. At this time, there was no
custody order. The parties remained largely physically separated and made custody arrangements
by agreement and Father's interactions with R██ were minimal. For the most part, Father only
saw the Child while visiting with Mother, rarely exercised his custodial rights, and had little, if
any, overnight visitation.

1



In late August of 2010, the parties once again aggressively argued and Father jumped onto the hood of Mother's car and broke her window while the Child was in the backseat of the vehicle. Mother filed a second P.F.A. petition against Father, and Father was arrested and jailed for a parole violation. Father was under state parole supervision. Thus, the violation led to his imprisonment. He was transported to Crawford County Correctional Facility for his P.F.A. hearing on October 13, 2010 and was involved in a violent and fatal altercation which was triggered by an argument with a prison guard. The incident led to charges against Father for murder, his ultimate conviction of involuntary manslaughter, and the continuation of his incarceration.

The day after the altercation, the parties appeared for the final P.F.A. hearing. Mother testified that she could not recognize Father as he had been bruised and blackened from the incident. Mother withdrew the P.F.A. petition and requested that R██ not be exposed to Father's condition at that time. Mother agreed to transport the Child to visit with Father in prison. When Father's appearance improved, Mother and R██ went to the prison to see Father. The prison's visitation settings only allowed for interaction through glass and conversation through phone, and R██ at that time was a toddler. While Mother made efforts to engage R██ in the visit, Father was frustrated by the circumstances. Father blamed Mother for the difficulty of visiting with the Child as well as his incarceration in general, and an argument ensued between the parties. Father spent most of the first visit focused on his fight with Mother rather than his opportunity to visit with R██. In the following months, Mother did not bring R██ back to the prison.

At Father's request, a *de novo* hearing was scheduled and informally held in April of 2011. At the hearing, Mother once again agreed to take the Child to visit with Father at the prison, and the Court directed that "...in the event that a problem rises in the next 90 days, ...either party may file a motion with the Prothonotary's Office requesting that a hearing be scheduled in front of this Court... and the Court will try to set up a video conference at that time." Father was back in the state system at that time. During the remainder of that year, Mother brought the Child to visit with Father on one occasion. However, Mother cooperated with Paternal Grandmother to take R██ to visit Father, and Paternal Grandmother brought R██ to the prison approximately five times. Similar to Father's experience with Mother's visits with R██, Father's interactions with R██ were minimal and not productive when Paternal Grandmother facilitated visits. During these visits, the Child wanted to run around and play rather than be tied to a phone cord, and Father did not respond positively. Eventually, visiting with the Child became too difficult for everyone, and the visits ceased. The testimony from all sources is clear that Father did not have any meaningful, positive interactions during R██s visits to the prison. Father was easily frustrated by the Child's inability to pay attention, and R██ did not meaningfully or positively engage with Father. Further, the record is devoid of any evidence to suggest that Father acted to prevent the discontinuance of the Child's visits. Father did not take consistent action to cause or compel either Mother or Paternal Grandmother to bring R██ to the prison for visitation. Moreover, the domestic relations docket is devoid of any petitions to the Court during this time regarding Mother's compliance with the parties' custody agreement.

2

While Father was first incarcerated and while Father was detained and awaiting trial, S.C.I. Albion provided Father with ten envelopes each month and with one phone call each week. Father maintains that he utilized his phone calls and envelopes in order to reach the Child. However, Mother credibly testified that the majority of the contacts with Father focused on the parties' relationship. Certainly the record is clear that Father's contacts with the Child were minimal, inconsistent, not parental, and did not build their relationship. Consistent with the history of the parties' interactions, the conversations often led to disagreements and resulted in Father blaming Mother for his circumstances. Any positive communication often appeared motivated by Father's interest in Mother's support to mitigate Father's criminal case as the charges were still pending against Father at that time. For instance, the most substantive piece of correspondence on record is a letter from Father asking Mother to write a letter to the undersigned to minimize the parties' domestic issues and to attend Father's sentencing with R███ in an attempt to draw sympathy. Despite the hostility between the parties and further lack of successful efforts, Mother actively wrote letters to Father and encouraged his relationship with R███ by including pictures the Child drew or relayed stories of R███ missing her dad.

After being convicted of involuntary manslaughter, Father was sentenced to prison for a minimum period of 30 months to a maximum period of 60 months in December of 2011. Father had been transferred to S.C.I. Greene, a facility significantly farther away from R███ than S.C.I. Albion. Father expressed that it was easier for him to contact loved ones at S.C.I. Albion due to the settings of the facility. However, even while Father was at S.C.I. Albion, Father's communication with R███ was minimal. The transfer made contacting the Child by telephone difficult because S.C.I. Greene charged money in order to connect an inmate. Thus, Father testified that he bought greeting cards from another inmate and sent them to R███ in 2012. Father recalled that the cards had unicorns, balloons, and teddy bears on them. The parties' accounts of Father's contacts are well disputed. Although Father testified to this occasion of purchasing and sending cards to R███, Mother credibly testified that, at that time, she gave R███ any correspondence from Father, and Mother's testimony is devoid of the receipt of such cards.

The credible evidence of record suggests that R███'s relationship with Father began to diminish in early 2012. Contact between the two became even more sporadic and, by Mother's observation, distressing to the Child. After one of R███'s limited phone conversations with Father, she kicked out a window panel. In June of that year, Father sent R███ a birthday card. However, Father was mistaken as to the Child's age, and the card was the only correspondence she received from Father around that timeframe.

In approximately November of 2013, Father called Mother to talk with the Child. Mother told Father that R███ was not around to talk. Father heard what he believed to be the Child in the background, and an argument ensued between the parties. From that point, Father did not communicate with the Child over the phone, and he allegedly decided to focus on contacting R███ through letters instead. However, the credible evidence of record shows that Father did not take the initiative to contact R███ via mail until July of 2014. Father never received a response from his July correspondence, and he did not write the Child again until September of 2014.

In December of 2013, Father was transferred from S.C.I. Greene to S.C.I. Smithfield, where he is currently incarcerated. At Smithfield, Father's phone calls are limited due to his

3

living status. Father testified that this restriction coupled with the difficulty Father experienced during his last phone conversation with Mother reaffirmed his choice to not "waste" his allotted phone calls on R██.

Paternal Grandmother testified of her efforts to visit with R██y. Paternal Grandmother explained that she proposed to Mother that R██ spend one Sunday per month at Paternal Grandmother's and have Father call to speak with R██ during such visits. Mother allowed R██ to have contact with Paternal Grandmother on a few occasions, and the record is devoid of any meaningful contact between Father and the Child as a result of such arrangements. Although Paternal Grandmother testified to her frustration regarding Mother's instances of refusing to exchange the Child for visits, her frustration largely surrounded Paternal Grandmother's own visitation time. The Domestic Relations docket remained idle throughout this time with Father taking no action for R██.

Father had not seen R██ since 2011 and took no action toward arranging for a visit until April of 2014 when he requested that Smithfield send Mother the appropriate DC-313 visitor form for R██. Before a minor can be placed on an inmate's visitor list, her parent must sign the DC-313 form. According to Corrections Counselor of Smithfield, Jeffrey Runk, the DC-313 form was sent to Mother but never signed and returned. Similarly, the form was sent again in February of 2015 without response from Mother.

Mother, Stepfather, and R██ moved to Wake County, North Carolina in July of 2014. That same month, after a long and troublesome span of time in which Father made no attempts to contact the Child, Father wrote an eight-line letter to R██y. According to Mother, the family relocated to be closer to Stepfather's family, to escape the incident surrounding Father's incarceration, and to allow Mother to obtain better employment as an early childhood educator. Mother's brother moved into the family's old household, and Mother informed the post office of her forwarding address. Mother and Stepfather married at the end of that same year. Stepfather has been a part of R██'s life since she was approximately two years old. Stepfather and R██ have a close relationship. R██ refers to Stepfather as "Dad" and considers his family as her own. Stepfather enjoys caring for the Child and has a history of picking R██ up from the school bus, making R██ dinner, and helping R██ with homework. It is clear that Stepfather serves as a parental figure in R██'s life, and he is ready, willing, and able to adopt the Child.

Father testified that he sent R██ two cards in approximately November of 2014 which he supported by a purchase receipt presented at the hearing. However, based on Mother's credible testimony, she never received these cards. Father also wrote a letter to the Child which was successfully forwarded to Mother's North Carolina residence. Father's note was a single paragraph in length. Father never heard back from R██y and became apprehensive as to Mother's whereabouts. Father asked Paternal Grandmother to inquire into the Child's living arrangements, and Paternal Grandmother allegedly could not obtain any information. That same month, Father motioned to modify the custody order. Prior to Father's motion, Father had not taken any action regarding the custody of R██y since early 2011.

The facts surrounding Father's child support obligation are highly disputed between the parties. According to Father, he initiated a federal lawsuit against Crawford County for the

4

benefit of ███. However, Mother contends and a review of the record supports that Father was only willing to pay for the accrued arrears and did not want any additional sums sequestered for ongoing support. The Court finds that Father had been in multiple positions in the support case in which he was able to provide financial support to R███ yet deliberately made minimal payments and had acted on multiple occasions to make it difficult for Mother to receive support.

Mother filed the subject Petition for Involuntary Termination of Parental Rights on April 27, 2015. The following month, Mother filed a Relocation Notice providing Father with R███ current address. Although Father has sent two letters to R███ since Mother filed the Petition to Terminate Father's Parental Rights, the Court shall not consider any remedial efforts initiated by Father subsequent to the filing of the Petition. 23 Pa. C.S.A. §2511(b).

Father has been in prison for all of R███'s life besides the approximately year and a half between his terms of incarceration. Father was in prison when R███ was born in ███████████, and Father is currently in prison as the Child is seven years old. During these periods of incarceration, Father has: visited with R███ in person on approximately five or six occasions, all of which occurred before 2012 and none of which resulted in positive interaction between Father and the Child; written only a few and no more than ten letters to R███ only a few of which included meaningful content and even less of which were actually for R███; mailed approximately two cards and no gifts to R███ and spoken only sporadically with R███ on the phone. Father's minimum date for release is May 9, 2016 with a maximum date for release being November 9, 2018. Father explained that, due to the nature of the incident surrounding his incarceration, he expects that he will be held for a period longer than his minimum date for release.

At the hearing, the guardian *ad litem* (G.A.L.) recommended that Father's parental rights be terminated to allow for Stepfather's adoption of R███. The G.A.L. conveyed that R███ is not connected with Father. The Child's only recollections of interactions with Father are an occasion in which they watched television together and the traumatic incident in which Father fought with Mother, jumped on the moving vehicle, and shattered the car's windshield. When asked about her family, R███ does not include Father as a member, and the Child does not ask about nor express an interest in contacting Father. At this point, Father's absence is not impactful to the Child.

## CONCLUSIONS OF LAW

Pursuant to 23 Pa. C.S.A. §2511, there are numerous grounds by which a petitioner may seek termination of the respondent's parental rights. In the case *sub judice*, the Petition was filed on the grounds set forth in subsections (a)(1) and (a)(2).

Under 23 Pa. C.S.A. §2511(a)(1), parental rights may be terminated where:

> "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."

Pursuant to 23 Pa. C.S.A. §2511(a)(2), parental rights may be terminated where:

> "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

It is the petitioner's burden to prove by clear and convincing evidence that her asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). The testimony must be so clear, direct, weighty, and convincing to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. *Id.*

In order to terminate parental rights, the court must engage in a bifurcated process. *In re C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008). First, the petitioner must prove that the respondent's conduct meets a statutory ground for termination delineated in §2511(a). *Id.* If the parent's conduct warrants termination of his parental rights, the court then must consider the needs and welfare of the child and determine the child's best interest. *Id.* One significant aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between the parent and his child. *Id.*

I. **During the six months preceding Mother's filing of the Petition, Father failed to perform his parental duties and evidenced a settled purpose of relinquishing parental claim to ████.**

To avoid the involuntary termination of parental rights, it is incumbent that the parent maintains communication with the child. *In re T.D.*, 949 A.2d 910, 919 (Pa. Super. 2008). This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself and preserve a place of importance in the child's life. *Id.*

Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). The affirmative duty of a parent requires a continuing interest in and a genuine effort to communicate and associate with the child. *In re E.M.*, 908 A.2d 297, 305 (Pa. Super. 2006). While incarceration of a parent does not, in itself, provide grounds for the termination of parental rights, a parent's responsibilities are not tolled during his incarceration. *In re D.J.S.*, 737, A.2d 283, 286 (Pa. Super. 1999). Instead, the court must analyze whether the parent utilized those resources available while in prison to maintain a relationship with the child. *In re Adoption of Dale A., II*, 683 A.2d 297, 302 (Pa Super. 1996).

A. **Father did not demonstrate a parental devotion through his contacts with ████**

Father has been incarcerated for the vast majority of R████'s life, and the evidence of record demonstrates that Father's contact with the Child while incarcerated was strongest in 2011. During this time, Father was presented with in-person contact with R████. Mother and

6

Paternal Grandmother facilitated approximately five visits, and Father did not take advantage of these opportunities. Father's frustration with the Child's behavior at the prison interfered with any positive interaction that the two could have enjoyed. Rather than focusing on his chance to see R███, Father was argumentative and spent the visits blaming others for his situation. Thus, no positive bonding between Father and the Child resulted from these visits. Further, the accounts conveyed to the Court appear consistent with the history of Father's relationship with Mother.

Similarly, Father's other forms of communication during this time were rarely centered on the Child. Father's letters and phone calls to Mother mostly discussed the parties' relationship and did not address the Child directly. Similarly, Father focused communications on his criminal case during the pendency of his sentencing while he should have instead acted to establish or maintain a bond with the Child. The warmest letter of record from Father was driven by his need for Mother to undermine the parties' history of domestic violence before the Court. This letter was also one of the few times on record that Father requested that Mother bring R███ to see him, and the request was made so that the Child would be present in the courtroom while Father was sentenced. Father coincidentally continued to maintain good terms with Mother while awaiting his sentence, and these good terms ended after Father's sentencing hearing.

Although Father's contact with the Child was at its strongest in 2011, the frequency and quality of his contact with R███ was insufficient as Father spent any opportunities to either argue with Mother about their circumstances or their relationship or attempt to persuade Mother to assist him in his criminal proceedings; and after Father's sentencing, Father's communications were, at best, sporadic. The instant case is similar to *In re J.E.S.*, 529 A.2d 514 (Pa. Super. 1987). There, the Superior Court of Pennsylvania affirmed the lower court's order terminating an incarcerated father's parental rights as the father sent his children four letters during an eighteen-month period. *Id.* He did not send gifts, contribute to their support, or call them on the telephone. *Id.* at 515. Like *In re J.E.S.*, Father has only occasionally contacted R███ since as early as November of 2013, a period of time well exceeding the statutory timeframe. Father could have and should have done more early on while the opportunities existed.

Father argues that his incarceration has constrained his ability to parent the Child. However, during the short period of time in which Father was not imprisoned, he failed to fulfill a parental role for R███. While Father lived with Mother and R███, Mother performed the bulk of the parental duties with little assistance from Father. Although Father spent time with the Child, it was not as a parent. Mother credibly testified to a family outing in which Father was drunk, under the influence of marijuana, and combative while in the Child's presence. Mother also stated that Father had left R███ unattended while she was still a baby.

Considering Father's involvement with R███ while both in and out of prison and before and after sentencing, the Court finds that Father has not sufficiently exerted himself throughout the Child's lifetime, and certainly not within the statutory six month timeframe before the filing of the Petition, to preserve a place of importance in R███'s life.

7

**B. Father created any barriers that stood between him and R▓▓.**

The common thread of Father's argument is that his incarceration coupled with Mother's alleged thwarting of Father's involvement with R▓▓ prevented Father from contacting the Child. However, in difficult circumstances, the parent must exercise reasonable firmness in resisting obstacles placed in the path of his relationship with the child. *In re E.M.*, 908 A.2d 297, 306 (Pa. Super. 2006). Here, the named barriers that allegedly disrupted Father's relationship with the Child were, in large part, a result of Father's own actions.

Father's incarceration has undoubtedly limited his ability to act as a parent. However, it was Father's action which led to his imprisonment. Father's incarcerations have been recurrent and tend to derive from aggressive offenses[1], and such evidence is relevant to this analysis as this same impulsive and violent behavior has strained Father's relationship with R▓▓ in the past. R▓▓ has witnessed Father commit both verbal and physical abuse. She has been present for several of Father's outbursts and fits of rage. Finally, Father's anger has interfered with the Child's limited number of contacts with Father as his focus during such occasions often narrowed in on his frustrations. Further, as discussed in greater detail above, Father did not act as a parent to R▓▓ even during the timeframe in which he was not incarcerated. Father's contention that he was unable to be a parent due to the confines of prison ignores Father's history of refusing or failing to perform parental duties even while a free man.

As for Father's claim that Mother has acted to hinder his relationship with R▓▓, the evidence of record adequately reflects a history, at least originally, of Mother encouraging Father to strengthen his relationship with R▓▓. Before Father's current incarceration, Mother orchestrated activities for the three of them to spend time together. Despite Mother's experience of Father's ongoing abuse, Mother participated in counseling with hopes that the parties could work things out. Mother's efforts to reconcile with Father were motivated, in large part, by her desire for Father to have a relationship with the Child.

After Father's current incarceration, Mother often wrote to Father and shared fond stories of R▓▓ with him. The content of Mother's letters shows a genuine desire and encouragement for Father to have a positive relationship with R▓▓. Even in letters written at a time when Mother and Father were not on good terms, there is no suggestion of vindictiveness from Mother. Mother made these efforts despite Father being argumentative, aggressive, and difficult. Mother brought the Child to visit with Father on a few occasions and coordinated with Paternal Grandmother to allow R▓▓ to visit more often. Mother testified that, with the exception of a letter sent after the Petition was filed, she has always provided R▓▓ with the correspondence she received from Father. While Father testified to his account of the mail he sent R▓▓ Father's testimony was inconsistent with the credible testimony of Mother which suggested that several of Father's alleged cards were never sent.

---

[1] Father was incarcerated for false imprisonment, simple assault, and kidnapping. Father then violated his resulting parole when he jumped onto Mother's vehicle and shattered the car's windshield, resulting in the allegations surrounding the P.F.A.

8

Although Father testified that the November of 2013 argument with Mother made it difficult for Father to reach R██ by telephone, Father did not make sufficient efforts to communicate with R██. There is no evidence of record that Father experienced any unsuccessful calls, and Father himself testified that he deliberately chose not to waste his allotted phone calls on R██. Even if Father did encounter unsuccessful attempts to call, the record is devoid of any mail correspondence from Father until nearly eight months later in July of 2014, and Father provided no explanation for such lapse. The next point of contact was not until September of that year when Father wrote R██ a letter.

Father argues that Mother interfered with his relationship with R██ because Mother and the Child moved in July of 2014 and Mother did not inform Father of the Child's address until May of 2015. The Pennsylvania's Relocation statute, 23 Pa. C.S.A. §5337, was not effective until after the parties' custody order had been entered. Thus, the standard notice which instructs parents that they may not relocate with the child without notifying the other parent was not attached to the parties' custody order. Although the statute took effect and applied to Mother before her move, the Court does not find the violation impactful in this case because Father had not mailed correspondence to the Child since sometime before November of 2013. Further, Mother set up a forwarding address for the postal service to deliver any mail to, and its operation was evidenced by the successful delivery of Father's letter from approximately November of 2014. In addition, Mother's brother subsequently moved into Mother's old residence. Thus, if there was any defect in the mail forwarding process, Mother's brother would likely have received the involved mail.

The Court finds Father's claim that he was unable to maintain a parental relationship with R██ due to the hurdles of his incarceration and Mother's interference to be ungrounded. Father did not sufficiently fulfill his parental role to the fullest extent possible while he was not imprisoned, Father's own conduct led to his current incarceration, and Father has not taken advantage of his opportunities to parent R██ or even contact her regularly while in prison. Regarding Mother, Mother has exhibited a history of willingness to cooperate and encourage Father's relationship with R██, and any of Mother's hesitations or passiveness over the past few years have been reactions to Father's discontinued contact with R██.

### C. Father did not utilize the opportunities available to him to act as a parent to ██

When faced with obstacles, a parent is required to utilize all available resources to preserve his relationship with the Child. *In re E.M.*, 908 A.2d at 306. Although limited, Father nonetheless has had multiple opportunities to fulfill his parental duty. As discussed above, the prisons provide visitation times for their inmates. These in-person encounters could be the most impactful means of contact available to Father. However, whenever R██ was transported to see Father, Father took these times for granted as the visits were not child-centered nor was R██ a priority of Father's visitation time. Instead, Father focused his energy on fighting.

Throughout the several institutions in which Father has been incarcerated, Father has always had, although limited, phone privileges available to him. However, Father testified that he deliberately chose not to use his calls for R██ after the November of 2013 argument because he did not want to "waste his calls". Consistent with this statement, Father never called for R██ at any time after that incident.

9

Similarly, it was well within Father's capacity to send mail to R██████more regularly than the credible evidence suggests. The receipt that Father entered into evidence reflects that the corrections facility sells cards to prisoners for $0.99.[2] Yet the credible evidence of record demonstrates that Father only sent one birthday card to R████ and, in doing so, Father had the Child's age mistaken. Additionally, Father has never sent R████ a gift. Even if purchasing a greeting card or gift was ever beyond Father's financial means, Father has demonstrated his acute ability to write letters to Mother and the Court throughout the history of his incarceration. However, Father has sent less than ten meaningful letters to R████over five years, and some of the letters of record are no longer than a few sentences. The Court recognizes that in some cases these brief messages are significant to a parent's relationship with his child. However, in this case, where the relationship is based primarily on mailed letters, the Court does not find the correspondence of record to establish or fulfill a parental role.

Although Father alleged that Mother intended to obstruct communication between Father and the Child, Father did not call on the Court to intervene at such times. Father demonstrated his keen grasp of and comfort with the operations of the court system. Father wrote to the Court on approximately three occasions in order to request a *de novo* hearing near the end of 2010 and at the beginning of 2011. Since late 2014, Father has written to the Court regarding his custodial rights over R███. Similarly, Father has actively, and oftentimes successfully, filed on his own behalf regarding his criminal and child support matters. Father has gotten himself to court by video conference or other accommodation regarding a P.F.A., custody, child support, a personal injury claim, and even the involuntary termination of parental rights hearing. In these writings, Father has shown that he is a smart, resourceful, and articulate individual; and when Father so desires, he can be active and aggressive in his participation with legal matters.

The issue here is the gap of time in which Father failed to act in the custody case. From the beginning of 2011 until late 2014, Father was silent within the custody docket. During this time, Mother had not signed and returned the DC-313 visit form, she had not taken the Child to visit with Father, and she had moved to North Carolina without providing Father with the proper notice. Yet during this time, Father did not petition Mother's contempt of the custody order nor did he request another *de novo* hearing; and Father was unaware of and unaffected by Mother's move as he had not been making significant attempts to contact R███

Father had no reason to be apprehensive toward such legal action as the Court has accommodated to Father's situation in the past. In April of 2011, Mother agreed to transport the Child to the prison for visits and the Court explicitly directed and encouraged Father to motion the Court for a hearing in the event that any issues were to arise. With an understanding of the complications surrounding Father's incarceration, the Court further expressed its willingness to facilitate a video conference.

---

[2] The Court does not accept that these cards were sent to R███ The only proof to support Father's claim is the receipt for sale of a Christmas card and a "Thinking of You" card, and Mother maintains that she never received either card in the mail. Assuming *arguendo* that Father's account is true, the cards' impact is not outcome determinative when weighed against the totality of the evidence. Father's participation and contact with R███have been so minimal that two greeting cards cannot serve to fulfill a parent's role.

10

Father has financially contributed to R███s upbringing in only minor ways, and this little support is inconsistent with Father's position in this case. Father claims he has done everything within his power to act as a parent to the Child. However, the record is devoid of any evidence to suggest that Father voluntarily financially supported R███ during the time in which Father was not incarcerated. While Father was incarcerated, he received a personal injury settlement. With Father's settlement, he paid only overdue child support, and Father exerted his ability to contact the Court by filing a *pro se* Motion to Vacate the Non-Dispursement [*sic*] Order. In this motion, Father asked the Court to vacate the order which directed his settlement toward future obligations and as, according to Father, the lien should only apply to arrearages. There is no evidence which suggests that Father voluntarily made any such payments after satisfying the overdue obligation.

The Court accepts the complexities of Father's situation and the limitations that he is surrounded by. It is clear that Father has fond memories of R███, and the Court understands that Father is disheartened by the time he has spent while in prison. As real as Father's feelings may be regarding the Child and his perception of their relationship, Father's actions do not mirror the legitimate emotions and wishes he expressed. His expressions of love appear genuine as does his wish that he could go back. The Court is satisfied Father would do better if he could do it all over. Unfortunately, the history of his abuse, misconduct, violence, and drugs all interfered with his chances to be a father.

The Court finds that Father failed to use the means available to him in order to continue a relationship with R███. The Petitioner has proven by clear and convincing evidence that Father refused or failed to perform parental duties.

## II. The severance of Father's parental rights would serve R███s best interest.

Pursuant to the second prong of the analysis, the Court must analyze the best interest of the Child by considering his developmental, physical, and emotional needs and welfare. 23 Pa. C.S.A. §2511(b). This analysis includes intangibles such as love, comfort, security, and stability. *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). The Court must discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond. *Id.*

After a careful reading of the record and review of evidence, this case does not yield any suggestion of a strong bond or of any bond at all. Besides a span of approximately a year and a half, Father has been incarcerated for all of R███s life. The record reflects that Father has not spoken with R███ since sometime before November of 2013 when the Child was approximately five years old. Further, Father has not seen R███ since approximately 2011 when the Child was approximately three years old, and the credible testimony of record indicates that R███ did not respond positively to seeing her Father at that time. Even while Father was not in prison, Father and the Child did not have a strong relationship as Father's interactions with R███ usually surrounded Father's primary purpose to visit with Mother. Although Father credibly testified to his love for R███ the analysis focuses on the parent and child's emotional bond and the effect on *the child* of permanently severing such bond. *In re Adoption of C.D.R.*, 111 A.3d 1212, 1215 (Pa. Super. 2015) (emphasis added). According to the G.A.L., R███s recollections of Father are: meager; in the instance of Father's dispute with Mother in August of 2010, negative; and,

11

presumably, traumatic. R█████ does not consider Father a part of her family nor did she express to the G.A.L. a legitimate interest in building a relationship with him.

Recognizing the lack of a parent-child bond between Father and R███ and that the severance of their relationship would be without detriment to R███ the Court looks to Petitioner's stated hope for Stepfather to adopt the Child. While Father has been incarcerated and absent for majority of R███'s upbringing, Stepfather has been a part of R███'s life since she was approximately two years old. Stepfather has cared for R███ in a parental capacity as he is active in her daily routine. Stepfather assists with transporting the Child to school, prepares meals for the Child, and teaches the Child. Stepfather and R███ have a strong, positive relationship, and R███ perceives Stepfather's family as her own. Stepfather has long provided financial and emotional support to R███ and he is ready, willing, and able to adopt the Child.

The G.A.L. recommended that the termination of Father's parental rights be granted and that the petition for adoption proceed. The G.A.L. conveyed to the Court that R███ considers Father a bad person and does not perceive him as a member of her family. The G.A.L. does not sense that R███ is connected to Father and does not believe that severance would detrimentally affect the Child. The Court accepts the G.A.L.'s recommendation as impactful and agrees.

Pursuant to 23 Pa. C.S.A. §2511, the Court holds that the Petitioner has proven by clear and convincing evidence that: 1) Father failed to perform his parental duties and exhibited a settled purpose of relinquishing his parental claim to R███; and 2) termination of Father's parental rights is in the best interest of the Child. Therefore, Father's parental rights must be terminated.

ACCORDINGLY, the Court enters the following Order:

cc:  Mary Ann Kirkpatrick, *Counsel for Respondent* - Box ✓
    Catherine Doyle, *Counsel for Petitioner* - Regular mail ✓
    Teresa Bliley, *Guardian ad Litem for Child* - Box ✓

    Chris Frank Esq - Box ✓
    A e SCF - Regular mail ✓

12

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION

In re: R█████████████

█████████████8

No. O.C. 2015-18

## ORDER

AND NOW, this 29th day of January, 2016, for the reasons set forth in the Memorandum attached to this Order, the Court finds that termination of the parental rights of Mr. G█████ B████ to the minor child R████████ is appropriate. This disposition is suited to the safety, protection, physical, mental, and moral welfare of the minor child.

## FINAL DECREE

AND NOW, this 29th day of January, 2016, after a review of the record, evidence, and arguments presented, the Court has issued the Findings of Fact and Conclusions of Law set forth in a Memorandum and attached to this Final Decree. Additionally the Court orders as follows:

1. The Petitioner has established a legal basis for the termination of the parental rights of ██. G█████ B████

2. It is hereby ordered, adjudged, and decreed that the parental rights of ██ G████ B███ for the child, R████████, are hereby now permanently and forever terminated.

3. The Court, in terminating the rights of ██. G████ B████ has given primary consideration to the statutory factors and also to the developmental, physical, and emotional needs and welfare of the child and believes that the needs and welfare of the child would best be promoted and met by the termination of parental rights.

4. The adoption of the child may proceed without further notice to or consent from the above-named parent.

5. **THIS IS A FINAL DECREE.**

6. The Court appoints _Chris Ferry Esq._ as counsel for Father. Father's current counsel, Mary Ann Kirkpatrick, has retired and is no longer representing parents.

7. Petitioner shall serve a true and correct copy of this Decree and all of the notices required upon the natural parent in any manner approved by the Pennsylvania Rules

13

of Civil Procedure governing him providing for service of an original pleading or summons in a civil case.

8. The appropriate proof of service shall be filed of record with the Clerk of Courts.

BY THE COURT,

_____
                                                        J.

cc:   Mary Ann Kirkpatrick, *Counsel for Respondent* - Box ✓
       Catherine Doyle, *Counsel for Petitioner* - regular mail ✓
       Teresa Bliley, *Guardian ad Litem for Child* - Box ✓